IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JESSE A. WILLNOW,

                Plaintiff,

v.

BEN TIERNEY,[1]

                Defendant.

OPINION and ORDER

22-cv-128-jdp

---

Plaintiff Jesse A. Willnow, appearing pro se, is a prisoner at Wisconsin Secure Program Facility. Willnow contends that defendant Ben Tierney, a sergeant at the prison, failed to prevent him from attempting to hang himself. I allowed Willnow to proceed on an Eighth Amendment claim against Tierney for ignoring his threats of self-harm. Dkt. 6.

Both sides have filed motions for summary judgment. I will grant Tierney's motion for summary judgment, I will deny Willnow's cross-motion for summary judgment, and I will dismiss the case because Willnow fails to show that his vague warnings of self-harm were enough to alert Tierney to a substantial risk that he would imminently attempt suicide, and because Tierney adequately responded once he learned that Willnow was harming himself.

PRELIMINARY MATTERS

Defendant Tierney filed a motion for extension of time to file his reply to his motion for summary judgment, Dkt. 42, which I will deny as unnecessary because the court already set the reply deadline as the date Tierney sought for an extension. Shortly after summary

---

[1] I have amended the caption to reflect the proper spelling on defendant's name as reflected in his submissions.

judgment briefing was completed, Willnow filed a motion to amend his summary judgment brief to include an argument opposing Tierney's qualified immunity defense. Dkt. 45. I will deny that motion because there is no need for further briefing on qualified immunity; I will resolve the case on the merits instead. Several months after summary judgment was completed, Willnow filed another motion to amend his summary judgment opposition, stating that he "forgot to address something because [he] was under the impression that [he] needed only respond to the defendants' statement of facts." Dkt. 46. Willnow filed this motion far too late for me to consider reopening briefing, and in any event the court does not require further briefing on the law; the parties' facts make the ruling here clear.

FACTS

Plaintiff Jesse Willnow is an inmate at Wisconsin Secure Program Facility (WSPF). Defendant Ben Tierney is a correctional sergeant at WSPF. This case involves events occurring on December 8, 2021. The parties dispute much of what happened. For completeness, I will lay out the parties' versions of the facts here. In the analysis section I will focus on the undisputed material facts.

Willnow says that at around 10:20 p.m., he pressed his cell's emergency intercom and told defendant Tierney that he was having "bad thoughts" of self-harm and that he wanted to be placed in observation status, to which Tierny responded, "Cool." Dkt. 21-2, at 1. Ten minutes later he again pressed the intercom and told Tierney that he needed to go on observation for his "bad thoughts," *id.*, to which Tierney responded by clicking off the intercom. A contemporaneous incident report from an officer escorting another prisoner stated

that he overheard Willnow saying, "Obs, I'm having thoughts" into the intercom. Dkt. 41-5, at 2.

Tierney largely denies that these events occurred. He states that at some point earlier in the night, Willnow used the intercom to request to speak with a supervisor. Tierney asked Willnow if it was an emergency and Willnow stated that it was not; Willnow did not tell Tierney that he was suicidal. Tierney told Willnow that he would see a supervisor later on rounds. Later, Tierney was informed that Willnow would not let staff secure the trap in his cell and Tierney was directed to secure the vestibule door between Willnow's cell door and the hallway. Willnow called Tierney on the intercom and told him that he wouldn't let go of the trap until a supervisor came. Willnow did not tell Tierney that he had thoughts of self-harm. Tierney asked non-defendant Sergeant Knockel to speak with Willnow.

It is undisputed that Knockel went to speak to Willnow; security camera footage shows that Knockel arrived at his cell at 10:49 p.m. *See* Dkt. 35-1 (placeholder entry for video footage). Non-defendant Sergeant Saylor arrived shortly thereafter.

The parties dispute the contents of the ensuing conversation. Willnow states that he told Knockel that he was suicidal. Willnow provides a declaration from Adrean Smith, an inmate in a neighboring cell. Smith states that Willnow told Knockel that Willnow was going to hang himself, and that Knockel responded that she would tell defendant Tierney. In her own declaration, Knockel denies that Willnow talked about hanging himself. She states that Willnow said that he had been trying to talk to a supervisor about what he believed was a threat from another inmate against a staff member, and that Willnow appeared agitated. Willnow also said that he wanted to go on observation. Knockel asked him if he was going to harm himself or if it would be OK for her to go speak to the captain about the alleged threat

3

against an officer; Willnow responded that he would be fine. The security footage shows that Knockel and Saylor left at 10:53 p.m. Knockel went to speak with the captain.

The parties dispute what happened next. Willnow says that shortly after the officers left he pushed his intercom again, but nobody answered. He then attempted to hang himself. Inmate Smith called Tierney to tell him that Willnow was attempting to hang himself. Tierney states that at 10:56 p.m., Willnow called him on the intercom and said that he was going to harm himself. Tierney responded by sending non-defendant Officer Farris to check on Willnow. Tierney then received the call from inmate Smith that Willnow was attempting self-harm.

It is undisputed that Officer Farris approached Willnow's cell and then yelled up the range that Willnow was hanging himself. Tierney sounded an alert and directed staff to Willnow's cell. Staff started assembling outside Willnow's cell at 10:57 p.m., and they entered Willnow's cell within two minutes. Willnow had attempted to hang himself by tethering a bed sheet to his trap, tying it around his neck and then leaning forward away from the door. Willnow's face was "a gray purplish color," and he was not immediately responsive. Dkt. 36-1, at 3. After removing the sheet from Willnow, the appropriate color returned to Willnow's face and he became responsive. Officers placed a collar on his neck, placed him on a spine board, and transported him to an ambulance outside the prison.

Willnow was taken to Gundersen Boscobel Area Hospital's emergency department. Willnow's first vitals were normal other than a mildly elevated heart rate with normal blood pressure and normal oxygen level. Upon examination, no signs of acute trauma were noted. He did have throat pain and tenderness to palpation on part of his spine. CT scans of his head and spine were negative. His lab work showed a significantly elevated level of creatine kinase (CK)

4

noted as "suggestive of significant tissue damage." Dkt. 37-1, at 8. The normal CK range is approximately 20 to 200 units per liter. Willnow was tested as 14,413 units per liter, which is indicative of rhabdomyolysis, a condition occurring from damaged muscle tissue releasing proteins and electrolytes into the blood or from prolonged immobilization or low oxygen in the body tissue.

Gundersen Boscobel Area Hospital did not feel comfortable managing Willnow's elevated CK levels and arranged for Willnow to be transferred to UW Hospital for further treatment. Willnow was admitted to UW Hospital for the treatment of rhabdomyolysis. Staff noted that Willnow did not have any signs or symptoms of serious injury. Willnow was discharged on December 10.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

Willnow brings an Eighth Amendment claim against defendant Tierney for failing to prevent him from harming himself. Under the Eighth Amendment, a claim that prison staff failed to prevent a prisoner from harming himself requires: (1) a strong likelihood that the prisoner would seriously harm himself in the near future; (2) that staff knew of that strong likelihood; and (3) that staff consciously failed to take reasonable measures to prevent the prisoner from harming himself. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012). A plaintiff must also show that he was indeed harmed by a defendant's actions or inactions. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020) ("risk is not compensable [for constitutional claim] without evidence of injury").

5

Tierney contends that he should be granted summary judgment because Willnow was not badly enough harmed by the attempted hanging to support a constitutional claim. He produces testimony from Dr. Ribault, who examined Willnow five days after the incident and concluded that he didn't have any lasting damage. Ribault also states that "[i]t is not clear what caused Mr. Willnow's rhabdomyolysis" because it was unlikely that the specific method that Willnow used to hang himself—leaning away from his cell door—would cause significant damage to the muscles in his neck, and because the trend of his CK readings were not entirely consistent with hanging: his reading of 14,413 units per liter was "abnormally high for a CK obtained just 40 minutes after a hanging incident" and his CK reading decreased over the next two days instead of peaking afterward as Ribault says it should have. Dkt. 37, at 6, 7.

I will reject this argument. Tierney is correct that Willnow must prove that he was actually harmed, but here that task appears straightforward: it is undisputed that Willnow tried to hang himself, his face was "gray purplish" when officers found him, and that he suffered rhabdomyolysis with CK levels high enough for Gundersen Boscobel Area Hospital to feel that it was necessary to transport him to UW Hospital. Tierney presents Dr. Ribault's testimony that it is "unclear" whether the suicide attempt caused Willnow's rhabdomyolysis, but this equivocal conclusion isn't enough to rule out that the hanging did cause it, and neither Tierney nor Ribault present any plausible alternative cause for Willnow's greatly elevated CK readings. In short, a reasonable jury could conclude that Willnow was harmed by his suicide attempt.

Tierney's other major argument is more persuasive: he argues that he initially was not aware that Willnow was imminently going to harm himself and that he later responded adequately once he was aware of the danger.

The parties dispute most of the details of their interactions and Willnow's interactions with Sergeant Knockel. For each of the parties' cross-motions for summary judgment I must resolve those disputes in favor of the non-moving party. But even accepting Willnow's version of the facts as true for purposes of defendant Tierney's summary judgment motion, no reasonable jury could conclude that Tierney ignored a substantial risk of harm to Willnow.

In screening Willnow's complaint, I stated that he would need to present evidence showing that "Tierney knew of a substantial risk that Willnow would harm himself *in the near future*." Dkt. 6, at 2 (emphasis in original). Willnow's original allegations that he was having "bad thoughts" alone would not be enough to alert Tierney to "the imminence of Willnow's suicide risk." *Id.* (citing *Wright v. Funk*, 853 F. App'x 22, 24 (7th Cir. 2021) ("[N]o reasonable jury could find that [prison staff] knew of a substantial risk of suicide based on [prisoner's] statements that he was having suicidal thoughts and would like to speak with someone from the psychological services unit."), and *Johnson v. Garant*, 786 F. App'x 609, 610 (7th Cir. 2019) ("[A] reasonable jury could not find that the defendants knew of a substantial risk of suicide based only on Johnson's statements that he felt suicidal and wanted to speak to a crisis counselor.")).

At summary judgment Willnow adds little to his original allegations. He repeats his initial statements that he was having "bad thoughts" of self-harm, which alone are not enough to sustain an Eighth Amendment claim under cases like *Wright* and *Johnson*. He now states that there was a third intercom call that Tierney ignored, but there is no evidence that Willnow raised a more specific, imminent threat to harm himself in that call. And in any event, Tierney adequately responded to Willnow's vague threats of self-harm by sending both Knockel and Farris to talk to him.

7

Willnow also adds evidence concerning his interaction with Sergeant Knockel: he says that he told Knockel that he was going to hang himself and that Knockel stated that she would tell Tierney. That was a direct threat about imminent self-harm that perhaps could support an Eighth Amendment claim. But there is no evidence from which I could draw a reasonable inference that Tierney was made aware of this statement: Knockel states that she left Willnow's cell to speak to the captain and that Willnow's self-harm occurred while she was on her way. So Willnow's more specific threat of self-harm does not support a claim against Tierney. Once Tierney learned that Willnow was trying to hang himself, he immediately directed staff to go into Willnow's cell to stop him. Therefore, I will grant Tierney's motion for summary judgment, I will deny Willnow's cross-motion for summary judgment, and I will dismiss the case.[2]

ORDER

IT IS ORDERED that:

1. Defendant Ben Tierney's motion for extension of time to file his reply to his motion for summary judgment, Dkt. 42, is DENIED.

2. Plaintiff Jesse A. Willnow's motions for extension of time to amend his summary judgment briefing, Dkts. 45 and 46, are DENIED.

3. Plaintiff's motion for summary judgment, Dkt. 18, is DENIED.

4. Defendant's motion for summary judgment, Dkt. 30, is GRANTED.

---

[2] Tierney also contends that he is entitled to qualified immunity on Willnow's Eighth Amendment claim. Because I am dismissing Willnow's claim on the merits, I need not consider Tierney's qualified immunity argument.

5. The clerk of court is directed to enter judgment accordingly and close this case.

Entered September 1, 2023.

                              BY THE COURT:

                              /s/
                              _____
                              JAMES D. PETERSON
                              District Judge